IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JANE DOE | Civil Action No. |
| *Plaintiff,* | |
| v. | **JURY TRIAL DEMANDED** |
| VANDERBILT UNIVERSITY and VICTORIA R. PICOTT | |
| *Defendants.* | |

## COMPLAINT

Plaintiff Jane Doe,[1] by and through her attorneys, for her Complaint against Vanderbilt

University (Vanderbilt or Defendant Vanderbilt) and Victoria R. Picott (Coach Picott or Defendant

Picott), alleges as follows:

## INTRODUCTION

1.      Despite the alarming reports in 2010 that "[s]exual relationships between coaches

and student-athletes [had] become a serious problem,"[2]  Vanderbilt University failed to implement

and/or enforce policies and practices to identify and prevent the grooming, exploitation, sexual

harassment and sexual abuse of its student-athletes by athletic department personnel.

---

1.      Although known to Defendant Vanderbilt, Plaintiff is named as a pseudonym "Jane Doe"
due to Plaintiff's compelling need for privacy as a sexual assault victim; additionally, during a
portion of the relevant time-frame discussed herein, Jane Doe was a minor.  Upon Order, Jane Doe
will file, under seal, a version of this Complaint that identifies Jane Doe to this Court.

2.      Deborah L. Brake, J.D. and Mariah Burton Nelson, MPH, CAE, "Staying in Bounds: An
NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and
Athletics Department Personnel," at 4 (NCAA 2010) ("Staying in Bounds"), available at
https://www.ncaa.org/sites/default/files/Staying+in+Bounds+Final.pdf.

2.     As a result of Vanderbilt's failures, at least one student-athlete for the Women's Basketball Program (the "Program"), Jane Doe, was groomed, exploited, sexually harassed, and sexually abused by one of the Program's assistant coaches, Defendant Picott.

3.     Like many victims of sexual abuse, Jane Doe felt guilt and immense shame for years, isolating herself and keeping the abuse a secret.

4.     After experiencing severe psychological and physical manifestations of the abuse, in April of 2022, Jane Doe began the difficult process of healing.  As a part of this process, Jane Doe undertook intensive trauma therapy in order to understand the source of her trauma.  In October of 2022, Jane Doe confronted Coach Picott, over Facetime, about the sexual abuse and realized, then, that Coach Picott knew she had taken advantage of and abused Jane Doe.

5.     Coach Picott used her position of trust and confidence as well as the toxic culture that existed within the Program, which Vanderbilt was aware of, to facilitate and hide her predatorial conduct.

6.     Prior to the filing of this lawsuit, on December 5, 2022, Jane Doe came forward and privately notified Vanderbilt that she had been "groomed, sexually harassed, isolated, intimidated and ultimately sexually assaulted by women's basketball Assistant Coach Victoria Picott" and "request[ed] that Vanderbilt conduct an internal investigation to determine whether there are other victims of Coach Picott's pattern and practice of sexual harassment and sexual abuse."

7.     Further, Jane Doe offered Vanderbilt University "an opportunity to address and resolve Jane Doe's claims through a confidential mediation process."

8.     Vanderbilt's response was insufficient.

9.     In addition to failing Jane Doe, again, Vanderbilt is failing its former and current student-athletes by refusing to determine whether there are other victims of Coach Picott's emotional, psychological, physical, and sexual abuse, choosing instead to turn a blind eye to a problem that remains an ongoing crisis within women's sports.

10.     By this lawsuit, Jane Doe comes forward and seeks to hold Vanderbilt accountable and to bring to the light the abusive conduct that has festered in the shadows.

11.     First, Jane Doe seeks injunctive and equitable relief requiring Vanderbilt to modify, implement and/or enforce policies and practices that are considered consensus best practices to protect student-athletes from grooming, exploitation, sexual harassment and sexual abuse by athletic department personnel now and in the future, including, *inter alia*:

   a.     prohibiting grooming, sexual harassment and sexual abuse of student-athletes by athletics department personnel;

   b.     prohibiting any romantic or sexual relationships between athletics department personnel and student-athletes that extends at least two years beyond the termination of the coach-athlete relationship; however, for student-athletes and coaches of other teams (that is, where the student-athlete was not coached by that individual), the prohibition on romantic or sexual relationships ends once the student-athlete is no longer a participant in the athletics program;

   c.     requiring athletic department personnel to immediately report any allegations of grooming, illicit relationships, harassment, or sexual abuse of a student-athlete by athletics department personnel;

   d.     mandating training of athletics department personnel regarding grooming, illicit relationships with student-athletes, harassment, and sexual abuse, the prohibition thereof, and reporting obligations;

   e.     mandating training of student-athletes to recognize the signs of grooming harassment, and sexual abuse by athletics department personnel;

   f.     providing confidential, independent avenues to report the abuse;

   g.     providing supportive measures and remedies to current and former student-athletes who were sexually abused and harassed;

h.    maintaining a centralized repository of all reports of grooming, illicit relationships, harassment, or sexual abuse of a student-athlete by athletics department personnel so that such complaints can be tracked;

i.    requiring that all reports of grooming, illicit relationships, harassment, or sexual abuse of a student-athlete by athletics department personnel be independently investigated;

j.    implementing public sanctions on athletics department personnel where allegations of grooming, illicit relationships, harassment, or sexual abuse of a student-athlete by athletics department personnel are substantiated;

k.    providing a safe environment for Vanderbilt student-athletes free from grooming, sexual abuse and harassment.

12.    Second, Jane seeks compensation for having been subjected to Coach Picott's grooming, exploitation, sexual harassment and sexual abuse as a result of Vanderbilt's failures, as detailed herein.

## PARTIES

13.    Plaintiff, Jane Doe, is an individual who resides in the Commonwealth of Pennsylvania and is a citizen of the United States. Jane Doe was a student at Vanderbilt University, receiving an athletic grant-in-aid as a member of the Program from in and around July 2007 until in and around August 2012.

14.    Defendant, Vanderbilt University, is a private research university, with its principal place of business in Nashville, Tennessee. During all material times, Vanderbilt received federal funding for its academic programs and activities, as contemplated by Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et. seq*.

15.    Defendant, Coach Picott, is a resident of the State of Texas and citizen of the United States. From in and around 2002 until in and around 2013, Coach Picott was an employee of Defendant Vanderbilt.

4

## JURISDICTION AND VENUE

16.     This Court has jurisdiction, pursuant to Title IX of the Education Amendment of 1972, 20 U.S.C. §§ 1681 *et. seq*., and the Fourteenth Amendment to the United States Constitution, through 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiff's related state law claims, pursuant to 28 U.S.C. § 1367, because the state law claims are so closely related to the federal law claims as to form one and the same case or controversy under Article III of the United States Constitution.

18.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred within the Middle District of Tennessee, namely in Nashville, Tennessee, at Vanderbilt University.

## FACTS

### *Student-Athletes are at Risk for being Groomed, Exploited, Sexually Harassed and Sexually Abused by Coaches.*

19.     All college students, as emerging adults, are encouraged to engage in self-exploration in order to develop a clear sense of self, commitment, and direction; and, are encouraged to engage in a variety of developmental tasks such as identity formation, becoming personally competent, developing interpersonal relationships, and planning for the future.[3]

20.     Student-athletes, however, face a unique set of circumstances, including: balancing athletic and academic endeavors while attempting to engage in social activities; overcoming athletic shortcomings, injuries, and challenges; developing relationships with teammates, support

---

3.     E.M. Heird & J. Steinfeldt, "An interpersonal psychotherapy approach to counseling student- athletes: Clinical implications of athletic identity," Journal of College Counseling, 16, pp. 143- 157 (2013).

staff, and coaches; developing and exhibiting mental toughness; compartmentalizing any off-the-court problems or challenges so as to not impact on-the-court performance; maintaining physical health and minimizing injuries in order to keep playing and performing at the required level; and, reconciling the termination of a life-long athletic career with the need to set goals for the future.

21. In 2003, Vanderbilt decided to eliminate its athletic department in an effort to provide student-athletes, in theory, with a more well-rounded college experience[4] and to avoid problems that plagued other institutions, including academic scandals involving student-athletes.[5]

22. While largely a "symbolic" restructuring, intercollegiate athletics at Vanderbilt became a part of the Division of Student Life and University Affairs.[6]

23. That restructuring should have increased oversight, ensuring strict compliance with gender equity laws and a safe environment for all students, but it ultimately has failed its most vulnerable.[7]

24. Student-athletes at Vanderbilt do not have a "normal" college experience.

---

4. Health, Thomas, "Vanderbilt Eliminates Athletic Department," The Washington Post (Sept. 10, 2003), available at https://www.washingtonpost.com/archive/sports/2003/09/10/vanderbilt-eliminates-athletic-department/a036d37d-92a3-40f8-8631-f855ea8ce6a0/

5. *Id.*

6. *Id.*

7. "Vanderbilt rape case: Timeline of key events," The Tennessean (June 23, 2015), available at https://www.tennessean.com/story/news/crime/2015/06/23/vanderbilt-rape-case-timeline-of-investigation-and-case/29183041/; O'Brien, Sara, "Breaking the Silence: Sexual Assault at Vanderbilt University," HuffPost (Oct. 4, 2013), available at https://www.huffpost.com/entry/sexual-assault-at-vanderbilt_b_4040918; Gibbs, Simons, "Multiple Vanderbilt football players accused of sexual misconduct," The Vanderbilt Hustler (June 26, 2020), available at https://vanderbilthustler.com/2020/06/26/multiple-vanderbilt-football-players-accused-of-sexual-misconduct/?print=true.

25.     Instead, the "Vanderbilt-type kids" that are recruited by the sports programs are required to be "driven academically as well as athletically" and must be "okay working really hard at both."[8]

26.     Indeed, nearly twenty years after its reorganization, a Vanderbilt student-athlete, Cailin Bracken, observed that playing sports in college remains "*really* hard."[9]   It often "feels like playing fruit ninja with a butter knife" because of the "chaos and overwhelm" of it all.[10]  She further noted that coaches and other adults involved with the student-athletes often forget that the student-athlete in front of them is "just a kid . . .  who simply wants to feel safe — who wants their approval, their support and who wants to feel like they can come crashing down and have a cushion to break their fall."[11]

27.     Student-athletes arrive at college with the expectation that they will become the best athlete they possibly can be under the supervision of educated, skilled, and fully vetted athletics department personnel looking out for their safety, well-being, and overall best interests.

28.     Student-athletes trust and believe in these individuals because they are taught to do so from a young age, and to give their coaches deference, respect, and unquestionable loyalty.

---

8.     "Melanie Balcomb was Born to Coach," Vanderbilt University (Dec. 12, 2012), available at https://vucommodores.com/melanie-balcomb-was-born-to-coach/.

9.     Bracken, Cailin, "Cailin Bracken: A Letter to College Sports," USA Lacrosse Magazine (Apr. 8, 2022), available at https://www.usalaxmagazine.com/college/women/cailin-bracken-a-letter-to-college-sports.

10.     *Id.*

11.      *Id*.

Case 3:23-cv-00426   Document 1   Filed 04/27/23   Page 7 of 52 PageID #: 7

29.     When other college students might be testing their emerging identity in school-based and friendship networks, the college student-athlete is spending significant time separated from these networks while they train and compete.

30.     In doing so, student-athletes spend numerous hours a day with their coaches, who exercise almost complete control over the student-athlete's life, including: dictating the time and length of practices and required team activities; scheduling individual and group workouts, conditioning, and weight lifting; requiring class-schedules to be oriented around their practice preferences; and summoning the student-athlete to their office for meetings.

31.     Regardless of whether the coach is suitable for the role, the coach becomes the student-athlete's trainer, advocate, mentor, counselor, and surrogate parent.

32.     Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of the non-profit Champion Women, which provides legal advocacy for girls and women in sport, has explained that the coach holds all the power in a relationship with the athlete, stating: "There is no balance of power, there's power one way, which is the coach has all the power and the athlete does not.... [The coach] has her scholarship, her ability to continue her education."[12]

33.     This power imbalance is especially prevalent at the highest level of intercollegiate athletics where "coaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport.  A coach's power over athletes can extend to virtually all aspects of the

---

12.     Barr, John and Nicole Noren, "Track & Fear," ESPN: Outside the Lines, available at http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-athletes-blackmail-violence-death-school-stopped-him (quoting Ms. Hogshead-Makar).

athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned."[13]

34.     With such ability to control comes great responsibility – after all, a student-athlete "treads a fine line between success and failure."[14]  Consequently, "[p]sychological damage can be caused by the withdrawal of the coach's attention" and "the young athlete often needs the attention of the coach in order to maintain form and the chance to succeed.  In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete."[15]  This process of "grooming" or "slow seduction" involves conduct and behaviors that build trust with the victim and "whereby one person gradually prepares another to accept 'special' attention, and then proceeds with sexual activity."[16]

35.     Researchers have determined that this "culture of sport," with substantial "power invested in the coach, facilitates an environment conducive to, and tolerant of, sexual exploitation."[17]

---

13.     Brake, Deborah L., "Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds," 22 Marq. Sports L. Rev. 395 (2012), at 405 (footnotes omitted), available at https://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1555&context=sportslaw.

14.     Brackenridge, Celia, "Playing safe: Assessing the risk of sexual abuse to elite child athletes," International Review for the Sociology of Sport: Special Issue on Youth Sport (1997) at 13, available at https://pdfs.semanticscholar.org/a1fe/585a19259091d9598e0f5ac63523e0ba0211.pdf?_ga=2.242843141.625218843.1581428881-2058641848.1581428881.

15.     *Id.*

16.     "Staying in Bounds," at p. 6.

17.     Bringer, Joy D., Celia H. Brackenridge, and Lynn H. Johnston, "Defining appropriateness in coach-athlete sexual relationships: The voice of coaches," The Journal of Sexual Aggression 8(2) (2002), at 83.

***The NCAA Identifies Sexual Relationships and Sexual Contact between a***
***Coach and Student-Athlete as Abuse.***

36.     In 2010, in response to the alarming realization that sexual relationships were occurring between coaches and student-athletes, the NCAA issued "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel," which was "designed to educate member institutions and their student-athletes about why sexual or romantic relationships between athletics department staff and student-athletes are inappropriate, how to avoid those relationships, and what to do if they occur."[18]

37.     The NCAA called upon member institutions, including Vanderbilt, to adopt the "model policy" it proposed, which "unambiguously and effectively prohibit[s] such relationships [between coaches and student-athletes] to ensure that sport programs offer a safe and empowering experience for all student-athletes."[19]

38.     The problem, the NCAA recognized, is that "**any** amorous or sexual relationship between coaches and student-athletes constitutes sexual abuse" since the coach holds all the power and the student-athlete holds none.[20]

39.     A coach wields tremendous emotional, psychological, and physical control and power over their student-athletes – "a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division

---

18.     "Staying in Bounds," at p. 4.

19.     *Id*.

20.     *Id.* (emphasis added).

I and II programs, scholarships that can mean the difference between being able to afford a college education or not."[21]

40.     Moreover, the coach is involved in and exercises broad control over the student-athlete's "physical fitness, diet, weight, sleep patterns, academic habits, and social life."[22]

41.     At the end of the day, "the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents."[23]

42.     Accordingly, the NCAA concluded that

[i]n the context of sports programs within institutions of higher learning, sexual abuse can occur regardless of the minor/adult status of the student-athlete, and regardless of the age difference between the perpetrator and victims. Whether the student-athlete is 17, 18, 19, 20, 21, or older, she or he is significantly less powerful than a head coach, assistant coach, . . . or other athletics department staff with supervisory control or authority over student-athletes. It is this power differential that makes such relationships inherently unequal, and when relationships are unequal, the concept of "mutual consent" becomes problematic.[24]

43.     "In other words, the dynamics of the coach-athlete relationship in intercollegiate sport make any sexual contact between a coach and an athlete abusive, regardless of whether it was 'wanted' by the athlete and regardless of whether the athlete is over the age of consent."[25]

---

21.     *Id.* at 15.

22.     *Id.*

23.     *Id*.

24.     *Id.* at 6.

25.     *Id*.

***Vanderbilt Did Not Implement and/or Enforce Policies or Practices to Prohibit Sexual Harassment and Sexual Abuse of Student-Athletes by Coaches.***

44.     Vanderbilt has touted that it has "zero tolerance for any acts that undermine the safety and well-being of any member of our community" and that they "take this [professional and moral] responsibility incredibly seriously."[26]

45.     This proclamation of "zero tolerance" has been largely ineffective.

46.     Vanderbilt prohibits "[*c*]*onsensual* sexual relationships . . . between a student and a staff member who is in a position to exercise power or authority over that student" and "[v]iolations of this policy by a staff member is grounds for performance improvement counseling, up to and including discharge."[27]

47.     Vanderbilt does not, upon information and belief, recognize that a student cannot consent to a sexual relationship with a staff member, like a coach, in a position to exercise power or authority over the student.  This failure to recognize the inability to consent is inconsistent with the NCAA's own view that any sexual contact between a coach and a collegiate athlete is *per se* abusive.

48.     Vanderbilt, upon information and belief, did not adopt the NCAA Model Policy and/or did not enforce the policies and rules that it had in place to categorically prohibit the grooming, exploitation, sexual harassment and/or sexual abuse of its student-athletes.

---

26.     "Message from Susan Wente and Candice Lee on addressing sexual assault and misconduct," Vanderbilt University (June 24, 2020), available at https://news.vanderbilt.edu/2020/06/24/message-from-susan-wente-and-candice-lee-on-addressing-sexual-assault-and-misconduct/.

27.     "Chapter 7: Consensual Relationships," Vanderbilt University: 2012-2013 Faculty Manual, available at https://web.archive.org/web/20121123002156/http://vanderbilt.edu/faculty-manual/part-iii-university-principles-and-policies/ch7-consensual-relationships/ (emphasis added).

49.     Vanderbilt, upon information and belief, failed to implement policies, practices and other measures to meet its duty to protect the health, safety and well-being of its students, including student-athletes, by complying with applicable gender-equity laws.

50.     Gender equity includes the right to be free from sexual harassment, sexual abuse, and sexual violence.

51.     Vanderbilt acknowledges that sexual harassment – the "unwelcome conduct of a sexual nature . . . includ[ing] unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature" – is a form of sex discrimination prohibited by Title IX.[28]

52.     Vanderbilt had and has a duty to promote gender equity and protect the health and safety of its student-athletes, some of the most easily victimized members of the student-body, but it failed to do so.

53.     As detailed herein, rather than protect its students, Vanderbilt chose to protect its own reputation and the reputation of its programs and departments, including the Program.

### *Jane Doe was Recruited by Coach Picott and the Program.*

54.     Growing up, Jane Doe dreamed of playing college basketball.

55.     By high school, Jane Doe's childhood dream was closer to becoming reality.

56.     Jane Doe attended a small, private Christian school, located in Birmingham, Alabama, where she excelled academically, by graduating as valedictorian, and athletically, by receiving numerous awards and recognitions for her participation as a varsity women's basketball player, including holding the school's all-time scoring and rebounding records.

---

27.     "Sexual Misconduct Including Harassment," Vanderbilt University: 2011-2012 Student Handbook, available at https://www.vanderbilt.edu/student_handbook/student-handbook-archives/pdfs/110824.pdf.

57.     As a result of her academic and athletic performance, Jane Doe, while still a minor, was recruited by numerous Division I women's basketball programs, including Vanderbilt.

58.     During summers, between school years, Jane Doe traveled to Nashville, Tennessee to attend, with her high-school varsity women's basketball team, the Program's team camp, which solidified Jane Doe's aspiration to play for the Program.

59.     Vanderbilt, which holds itself out as "globally renowned for its transformative education and research,"[29] was ranked in the Top 25 of national universities in the U.S. News and World Report's annual report.[30]  Moreover,  the Program also was ranked in the Top 25 of Division I women's basketball programs.[31]

60.     The Program also represented itself as having coaches and support staff who were safe, trustworthy, and of high ethical repute such that parents of prospective student-athletes and prospective student-athletes need not worry about interactions with members of the coaching or support staff who would spend a substantial time with their daughters and exercise substantial control over them.  The Program did so to recruit new student-athletes and maintain its status as an elite program.

61.     The Program's coaching staff included Head Coach Melanie Balcomb and three (3) assistant coaches, who served as the recruiting coordinator, the guards position coach, and the

---

29.     "Quick         Facts,"       Vanderbilt       University       (2023),       available       at https://www.vanderbilt.edu/about/quick-facts/.

30.     "Vanderbilt ranked No. 18 national university by U.S. News," Vanderbilt University: News (Aug. 22, 2008), available at https://news.vanderbilt.edu/2008/08/22/vanderbilt-ranked-no-18-national-university-by-us-news-63021/.

31.     "Seven Vanderbilt teams ranked in Top 25," Vanderbilt University: News (Feb. 23, 2007), available   at   https://news.vanderbilt.edu/2007/02/23/seven-vanderbilt-teams-ranked-in-top-25-58716/.

posts position coach, respectively. The Program also had a strength and conditioning coach as well as an athletic trainer and additional support staff.

62. Coach Balcomb became the Program's head coach in 2002, and brought with her Coach Picott, the Program's assistant coach responsible for post-player development.

63. By the time Jane Doe was recruited by the Program, Coach Picott had been a college women's basketball coach for over a decade, coaching at Drexel (1994-1995), Temple (1995-2000), Xavier (2000-2002), and Vanderbilt (2002-2013). She also was a stand-out basketball player in her own right, which garnered additional respect and admiration.

64. On or about August 8, 2006, before Jane Doe began her senior year of high school, Coach Picott and the assistant coach responsible for recruiting offered Jane Doe a "full-ride" athletic scholarship on behalf of the Program.

65. Before making a decision, Jane Doe, who was still a minor, asked to speak with her parents. Coach Picott told Jane Doe that she was Coach Picott's top pick for this scholarship (for a post-player), but that the Program needed to have her decision soon because they would offer the scholarship to another recruit if Jane Doe was not going to commit to the Program.

66. While Jane Doe had not yet taken any of her "official visits" to the other programs that were recruiting her, Jane Doe was excited about the opportunity to attend a university that was one of the best-of-the-best, both academically and athletically, and the "best" program to recruit her. Moreover, playing for the Program would enable Jane Doe to improve her basketball skills under the tutelage and mentorship of Coach Picott, who held herself out as developing stand-out post players.

67. Thus, on or about August 9, 2006, Jane Doe verbally committed to attend Vanderbilt as a student-athlete with the Program.

15

68.	Once Jane Doe had committed to the Program, the Program invited Jane Doe and her family for an "official visit" at Vanderbilt.  Because the Program knew that Jane Doe was a Christian, one of the scheduled events for Jane Doe's "official visit" was attending church with some of the Program's current student-athletes.

69.	During the fall signing period, on or about November 8, 2006, Jane Doe signed her National Letter of Intent (NLI) to certify her decision to enroll at Vanderbilt as a student and member of the Program.

70.	On or about February 26, 2007, Jane Doe received a letter confirming that she would receive an "athletic grant-in-aid" from Vanderbilt, which was a "full scholarship" and included tuition, fees, room, board, and books.

***The Program Reassured Jane Doe that Sexual Abuse was not Occurring within the Program.***

71.	On or about March 7, 2007, the college women's basketball community was shocked to learn that one of the head coaches for an elite program within the SEC resigned amid reports that she had an illicit relationship with a former player.[32]

72.	At the conclusion of the 2006-2007 season, one of the Program's assistant coaches left the Program for a position with another women's basketball program.  Because of the staffing change, Coach Balcomb called Jane Doe to inform her of the assistant coach's departure and that the Program was actively looking to hire a new recruiting coordinator.

73.	Coach Balcomb explicitly reassured Jane Doe that the assistant coach's departure was for professional reasons and had nothing to do with improper sexual conduct.

---

32.	"Sources: Chatman quit amid sexual misconduct claims," ESPN (Mar. 8, 2007), available at  https://www.espn.com/womens-college-basketball/news/story?id=2791950.

74. Coach Balcomb also implicitly reassured Jane Doe that the Program's current coaches and staff were not a threat to Jane Doe or any student-athlete.

75. Jane Doe believed Coach Balcomb's reassurance and remained committed to attend Vanderbilt as a member of the Program.

### Coach Picott Grooms Jane Doe.

76. In July of 2007, Jane Doe began her collegiate career at Vanderbilt, attending summer classes and working out with her teammates.

77. Notwithstanding Jane Doe's excitement to begin college and the opportunities ahead of her, Jane Doe, who was close to her family and came from a small-high school environment, had difficulty adjusting to college life, including experiencing severe homesickness.

78. To make matters worse, in the fall of her freshmen year, Jane Doe's teenage sibling became severely ill, which required Jane Doe's family to move, in the summer of 2008, from Alabama to Missouri for her sibling's medical treatment. Jane Doe's sibling remained severely ill during Jane Doe's entire time at Vanderbilt.

79. Jane Doe was forced to quickly "grow up" and "adjust" to not only college life but also a new family life.

80. Family health challenges and her own injuries and health challenges continued to plague Jane Doe's time at Vanderbilt.

81. In the fall of Jane Doe's sophomore year of college, one of Jane Doe's parents also required extended medical treatment for a similar illness as her sibling.

82. In the middle of Jane Doe's sophomore year of college, Jane Doe was required to sit out the second-half of her sophomore year for a similar illness as her sibling.

83. Additionally, during Jane Doe's junior year of college, Jane Doe's grandfather passed away.

84. With each of these difficult experiences, Coach Picott was one of the first people in whom Jane Doe confided.

85. Coach Picott reassured Jane Doe that she had a "family" with the Program and that the coaching staff would do whatever they could for Jane Doe and her family.

86. While meaningful to Jane Doe, at the time, Coach Picott used these experiences as opportunities to "groom" Jane Doe by engaging in behaviors, such as personally ingratiating herself with Jane Doe and establishing and developing an emotional bond with Jane Doe, that enabled Coach Picott to gain Jane Doe's trust and ultimately enabled her to sexually abuse Jane Doe.

87. Coach Picott, who knew how close Jane Doe was with her family, also ingratiated herself with Jane Doe's family, including Jane Doe's parents, siblings and extended family members.

88. Coach Picott ultimately helped to arrange for Jane Doe's family to surprise her during her senior night game, in March of 2011, by having Jane Doe's family, including her younger sibling who had not been able to attend any of Jane Doe's games due to her illness, attend the game.

89. Then, during Jane Doe's senior year of college, Coach Picott's mother became gravely ill.

90. Coach Picott turned to Jane Doe for support and regularly asked that Jane Doe pray for her mother. Coach Picott informed Jane Doe that she was "new" to prayer but admired Jane

Doe's faith and how Jane Doe handled the experiences she had faced over the last several years despite being so young.

91. Jane Doe, who had been very open about her Christian faith while at Vanderbilt and was one of the student-leaders for WhoUWith Ministries, was hopeful that this opportunity to pray for Coach Picott's mother and talk with Coach Picott about faith would encourage Coach Picott to find her own faith.

92. Coach Picott, however, used this situation as another opportunity to personally ingratiate herself with Jane Doe and further develop her emotional (and spiritual) bond with Jane Doe.

93. With each difficult experience that Jane Doe faced, her trust, belief, respect, and unquestionable loyalty in Coach Picott increased.

***Coach Picott Normalized Physical Contact with Student-Athletes, including Jane Doe***

94. Coach Picott, who was actively involved in player development and known for her unique style of post-player footwork and positioning called "u-ing" in the post, normalized physical contact with her student-athletes, including Jane Doe.

95. Coach Picott regularly participated in drills and demonstrated proper footwork and positioning on the student-athletes, which facilitated her ability to touch and maintain close physical contact with her student-athletes.

96. Coach Picott was also "handsy" with the student athletes – that is, touching their backs, side and/or arms when talking to them, holding their jerseys to keep them close to her while she spoke to them, and squeezing their side, arms, or thighs while sitting next to them on the bench during games. Vanderbilt athletic staff were fully aware of Coach Picott's conduct and Coach Picott's physical contact with her student-athletes was not questioned.

97. Coach Picott also bragged about being a person who gave "good" hugs and gave overly intimate full-body hugs to, among others, her student-athletes.

98. Coach Picott gave hugs as a way of "reassuring" her student-athletes, showing that she "cared" about them, and further ingratiating herself with her student-athletes. Vanderbilt athletic staff were fully aware of Coach Picott's conduct and Coach Picott's physical contact with her student-athletes was not questioned.

### Vanderbilt Permits a Toxic Culture to Exist within the Program which Enabled Coach Picott's Inappropriate Behavior.

99. Notwithstanding the public-façade of being "family-oriented," "relatable", and "supportive," Coach Balcomb created and maintained a fear-based culture within the Program.

100. Coach Balcomb created an environment where student-athletes were afraid to fail, afraid to make a mistake, and afraid to disagree with Coach Balcomb.

101. For example, after missing a shot or turning the ball over during a game, student-athletes would, almost instantly, look towards the bench to see if Coach Balcomb had called for their replacement and were given few—if any—opportunities to learn from their mistakes or to "get it back." During practices, if a student-athlete made a mistake, that student-athlete would be singled out and berated, and the team would often be punished as well.

102. It was well-known that once a student-athlete was in the "dog-house" (i.e. not in Coach Balcomb's good graces) it was difficult, if not impossible, for that student-athlete to get out.

103. Coach Balcomb also chose players she could "make an example of" by kicking them out of practice, telling them to "go home," or otherwise punishing them.

104. Coach Balcomb similarly demeaned and belittled members of her coaching staff.

105.    Coarse language, including profanity and derogatory terms (e.g. "pussies"), was regularly used and served no productive or motivational purpose.

106.    Members of the Program and athletic personnel at Vanderbilt were tolerant of this verbal and emotional abuse, which included belittling, threatening, humiliating, scapegoating, rejecting, isolating and ignoring.

107.    Student-athletes, in particular, who did not know differently, catered to Coach Balcomb and accepted this culture, because they did not want to be perceived as "weak". After all, the ubiquity of certain demeaning comments and remarks as merely "tough coaching," "building" mental toughness, and teaching "life lessons," normalized the toxic culture and abuse.

108.    Vanderbilt athletic personnel outside of the Program were aware of this toxic culture.

109.    Yet because the Program experienced success, at least based upon season records and graduation rates, Vanderbilt tolerated this culture.

110.    The culture, however, created yet another opportunity for Coach Picott to groom and ingratiate herself with the players, because she appeared to be the only assistant coach who would "stand-up" to Coach Balcomb and was viewed, at least at times, as the "rational" and "reasonable" coach that the players, including Jane Doe, could turn to for support and advice.

***Coach Picott and Other Members of the Program Invite Jane Doe to Continue to "Give Back" to the Program as a Graduate Student***

111.    By the end of Jane Doe's senior year, Coach Picott was the one sounding board and confidant on the coaching staff that Jane Doe had, and Jane Doe respected Coach Picott immensely.

112.    After the 2011-2012 season, but before graduation, Jane Doe was invited by the Program, and encouraged by Coach Picott, to continue her education as a graduate student at Vanderbilt and to continue with the Program as a graduate assistant.

113.    Jane Doe had already been accepted and was scheduled to begin law school in the fall in Pennsylvania; however, upon learning of this opportunity, the law school encouraged Jane Doe to pursue it and permitted her to defer law school for one year.

114.    Unbeknownst to Jane Doe, Coach Balcomb and other members of the coaching staff intended on petitioning the NCAA so that Jane Doe could have eligibility to dress-out (or play) during the 2011-2012 season, since she sat out the second-half of her sophomore year for medical reasons.

115.    In and around the Summer of 2011, after Jane Doe had already deferred law school and was enrolled as a graduate student at Vanderbilt, Coach Balcomb and another assistant coach informed Jane Doe that she had eligibility remaining and they intended on having her "compete" as a "fifth-year senior" during the 2011-2012 season.[33]

116.    After learning of this, Jane Doe met with then-senior women's administrator, Candice Storey Lee regarding her concern that she was going to be required to "compete."

117.    Jane Doe advised Lee that she had not been told about this when she agreed to stay for her fifth year and that she could not dress-out for the Program based upon her experiences

_____

33.    2011-2012 NCAA Division I Manual, NCAA Bylaw 14.1.9 (effective August 1, 2011), available at https://www.ncaapublications.com/productdownloads/D112.pdf. ("A student-athlete who is enrolled in a graduate or professional school of the same institution from which he or she previously received a baccalaureate degree . . . may participate in intercollegiate athletics, provided the student has eligibility remaining and such participation occurs within the applicable five-year period set forth in Bylaw 14.2 (see Bylaw 14.1.8.2.1.4)).

during her first four years at Vanderbilt. Jane Doe further advised that if she would be required to do so, she would withdraw from Vanderbilt and take a gap-year before beginning law school.

118.    Jane Doe expressed, however, her sincere desire to do whatever else she could do to positively impact the Program.

119.    Lee advised Jane Doe that she understood Jane Doe's reasons for not wanting to "dress-out," that Jane Doe would not be required to "compete," that Vanderbilt would honor its promise to her to continue her education, and that Lee would handle resolving this issue with Coach Balcomb.

120.    Coach Balcomb thereafter informed Jane Doe that she would not be required to dress-out and compete, but would instead remain on scholarship as a student-athlete affiliated with the Program while completing her master's degree within approximately 14 months.

***Coach Picott Grooms, Exploits, Sexually Harasses, and Sexually Abuses Jane Doe.***

121.    On or about June 2, 2011, Jane Doe was accepted and enrolled as a graduate student at Vanderbilt to pursue her Masters of Education in the Organizational Leadership program.

122.    On or about June 10, 2011, Jane Doe began her first graduate school class.

123.    On or about June 17, 2011, Coach Picott's mother passed away.

124.    When Coach Picott returned to Nashville, following her mother's funeral, she used the passing of her mother as yet another opportunity to groom and ingratiate herself to Jane Doe.

125.    Coach Picott expressed increasing interest in religion and informed Jane Doe that she wanted to have accountability and to develop her own faith. Since she respected Jane Doe for her faith, she asked Jane Doe to provide her with that accountability and she and Jane Doe began a morning Bible study.

126.    Once again, Jane Doe was encouraged to hear that Coach Picott was interested in developing her own faith and even invited Coach Picott to attend church with her.

127.    On one occasion, Coach Picott and Coach Picott's then-girlfriend did attend church with Jane Doe.

128.    During their Bible study meetings, Coach Picott began "opening up" with Jane Doe, discussing her childhood, her family, and other life events and also began sharing more intimate and sexualized personal details.  For example, Coach Picott confided in Jane Doe that she had difficulty maintaining healthy relationships, she cheated on her girlfriends, she was sexually abused as a child, she was currently in a relationship outside of her committed one, and she was in therapy for sex-addiction.

129.    Coach Picott continued to groom Jane Doe through expressions of gratitude for Jane Doe's friendship and that Jane Doe did not judge her – Coach Picott was aware that Jane Doe's sincerely held religious beliefs included that Christians should not have sex outside of marriage or have same-sex sexual relationships – and by requesting to spend more and more time with Jane Doe.

130.    Coach Picott's grooming, however, became more overt and aggressive and Coach Picott also began stalking Jane Doe.  For example, when Jane Doe was attending classes, Coach Picott parked outside of Payne Hall on Vanderbilt's campus, which is where Jane Doe's classes were held, and asked Jane Doe to meet her in the parking lot and sit with Coach Picott in her car.

131.    Coach Picott continued to talk to Jane Doe about personal matters and encouraged Jane Doe to share information about herself as well.  For example, Jane Doe discussed with Coach Picott the fact that she was "talking" to her former boyfriend, and they were considering getting

back together.  Jane Doe also shared that she was a virgin who did not, on the basis of her sincerely held religious beliefs, want to have sexual intercourse until she was married.

132.    On or about August 27, 2011, Coach Picott sent Jane Doe a text message while she was in class regarding working out, which read:

> Hey I know you are in class but I am working our [sic] in the mornings if you need a partner.  I could sure use one [smiley emoji].

133.    Jane Doe knew Coach Picott had an effective workout routine, so Jane Doe agreed to work out with Coach Picott.  Coach Picott requested that they meet early in the morning at Vanderbilt's Olympic weight room and Jane Doe agreed.

134.    Coach Picott chose exercises that required a "spotter" or assistance from a second person as well as exercises that required her to touch Jane Doe and visa-versa.  For example, she chose off-bench obliques, which required Jane Doe to straddle Coach Picott's legs and Coach Picott to straddle Jane Doe's.

135.    While performing these exercises, Coach Picott would make suggestive noises and/or comments, particularly when Jane Doe was straddling Coach Picott's legs.

136.    Jane Doe was confused by Coach Picott's comments, but it was not uncommon for the coaching staff, or other athletic personnel, to comment on the student-athletes' physiques, and Coach Picott was no exception.

137.    In addition to in-person conversations, Coach Picott utilized her Vanderbilt-issued cell phone to groom Jane Doe and later facilitate her sexual abuse of Jane Doe.

138.    For example, while Coach Picott was conducting an out-of-town home-visit with one of the recruits for the following year, Coach Picott sent Jane Doe the following text:

> Too beautiful. . . by the way, [prospective player]'s mom went on and on about how beautiful you are.  The perfect, all American girl she said
> She kept telling her father in law oh you'll love her dad [kissing face emoji].

139.    Coach Picott sought out every opportunity to spend time with Jane Doe – early morning work outs, post-workout breakfast, morning coffee, picking up lunch for the coaching staff, mid-afternoon coffee breaks, and dinners.  Vanderbilt athletic staff were fully aware of Coach Picott's conduct and the amount of time that Coach Picott was spending with Jane Doe, which was not questioned.

140.    Jane Doe, as a student-athlete and twenty-years younger than Coach Picott, had little choice but to agree to Coach Picott's demands.

141.    Jane Doe was unable to terminate the coach-athlete and coach-mentor relationship that had developed.

142.    Moreover, Jane Doe was expected to participate in practices and other on-court activity with post-players, which necessitated her further contact with Coach Picott.

143.    On one occasion, Coach Picott invited Jane Doe to get dinner and drinks at Jackson's restaurant on 21st Avenue.  While sitting at the bar, Coach Picott wrote Jane Doe a note on a napkin, which stated: "you're absolutely gorgeous, wow."  Although taken aback by Coach Picott's note, Jane Doe had, at the time, worked very hard to lose the weight she had gained during her junior and senior seasons at Vanderbilt and to develop a more toned and slim physique.  Thus, hearing Coach Picott compliment her physique was encouraging but also something that meant much more given that Coach Picott was fit.

144.    Shortly thereafter, Coach Picott began telling Jane Doe that she was sexually attracted to Jane Doe and Coach Picott routinely made comments regarding Jane Doe's appearance and physical conditioning.

145.    Coach Picott also told Jane Doe that she had taken notice of Jane Doe during Jane Doe's first four years at Vanderbilt.

146.    Coach Picott insisted that Jane Doe wear certain clothing, which, according to Coach Picott, accentuated Jane Doe's buttocks, chest and arms.

147.    After these overt sexual overtures began and while Jane Doe was still a graduate student and graduate assistant, Coach Picott and the other female staff invited Jane Doe to use the female coaches' locker room, which was located directly across the hallway from the coaches' offices and was more convenient for Jane Doe than using the players' locker room.

148.    Soon after Jane Doe began using the female coaches' locker room, Coach Picott began following, either at the same time or shortly thereafter, Jane Doe into the locker room.   Jane Doe did not feel as though she could question Coach Picott or object to her presence.

149.    Coach Picott would also text or otherwise communicate with Jane Doe to meet her in the locker room, claiming that she needed to see her.  Jane Doe did not feel as though she could question Coach Picott or ignore her demands.

150.    Coach Picott tried to and did isolate Jane Doe, which enabled Coach Picott to make physical advancements on Jane Doe and her grooming became more aggressive, normalizing physical contact.

151.    Coach Picott would "bump" into Jane Doe in the locker room, pretend to box out, or perform other post moves on Jane Doe.  Some of this contact was consistent with the physical contact that Jane Doe was used to from her first four years with the Program.

152.    Coach Picott watched as Jane Doe changed clothes after they worked out.  Jane Doe was used to changing in a female locker room but was self-conscious and not comfortable being completely naked in the locker room, unless she was alone.  Jane Doe, when changing, attempted to cover herself and avoid unnecessary exposure.  Coach Picott would make jokes about Jane Doe's efforts to cover herself and tried normalizing changing openly.  For example, Coach

Picott changed clothes and was entirely naked in front of Jane Doe and the female athletic staff. Jane Doe did not feel as though she could question Coach Picott or object to her presence.

153.    Coach Picott would pull at Jane Doe's towel or try to "peek" at her and opened the shower door while Jane Doe was showering to stare at her and comment on her physique.  Jane Doe did not feel as though she could question Coach Picott or object to her presence.

154.    When Coach Picott had Jane Doe in a car, Coach Picott attempted to hold Jane Doe's hand, held Jane Doe's hand, placed her hand on Jane Doe's lap and held onto Jane Doe's upper thighs.  Coach Picott acted surprised when her hand "landed" near Jane Doe's crotch and indicated that she would "just rest" her hand there.  Jane Doe could not believe what was occurring and often felt paralyzed with the fear, embarrassment and confusion.  Jane Doe did not feel as though she could question Coach Picott or object to her conduct.

155.    Coach Picott wore Jane Doe's resistance down and engaged in coercive behavior, which ultimately led to Jane Doe's submission to her sexual advances, including sexual contact/touching.

156.    For example, leading up to the first time Coach Picott kissed Jane Doe, in the car while parked in the 25th Avenue Parking Garage on Vanderbilt's campus, Coach Picott played and sang the song "Are You Gonna Kiss Me or Not" by Thompson Square every time they were in the car together.

157.    Once Coach Picott had kissed Jane Doe, her sexual advances towards Jane Doe escalated and occurred multiple times a day on, inter alia, Vanderbilt's campus.

158.    Coach Picott often parked in isolated areas, away from public view such as in parking garages, located near shrubbery, or other structures that blocked an outsider's view.

159.    Coach Picott often wanted to use Jane Doe's car because it had tinted windows and because Coach Picott thought her then girlfriend may have "bugged" her car.

160.    Jane Doe had never had any sexual experiences before, but Coach Picott had groomed Jane Doe to a place wherein she submitted.

161.    Coach Picott began performing sexual acts on Jane Doe, which occurred in the coaches' locker room, on Vanderbilt's campus, as well as in Coach Picott's hotel room while traveling for the Program's away games.

162.    In furtherance of her predatory behavior, Coach Picott hypersexualized Jane Doe and attempted to normalize what she did or wanted to do to Jane Doe, maintaining that she would not penetrate Jane Doe.

163.    Coach Picott sexually assaulted Jane Doe numerous times a day and on a near-daily basis.  Before, during and after the sexual abuse, Jane Doe was terrified, felt trapped and paralyzed.

164.    While traveling for the Program's away games, Coach Picott requested that Jane Doe come to her hotel room late at night and stay into the early morning hours, since Coach Picott did not have a roommate.  Coach Picott used these encounters to have sexual contact with Jane Doe in the hotel room.

165.    Coach Picott continued to hypersexualize Jane Doe, expressed her frustration with Jane Doe, continued to normalize what she did or wanted to do to Jane Doe, and expressed an increasing desire to engage in sexual intercourse with Jane Doe.

166.    After months of wearing Jane Doe down, engaging in coercive behavior, and grooming Jane Doe, Jane Doe submitted to Coach Picott.

167.    On or about March 17-21, 2012, the Program stayed at the Embassy Suites, in Nashville, near Vanderbilt's campus for the first and second round of the NCAA tournament and,

in Jane Doe's hotel room, Coach Picott sexually assaulted Jane Doe, performing sexual intercourse.

168.     Coach Picott's sexual assaults against Jane Doe continued on a near-daily basis and multiple times a day.

169.     Beginning in the summer of 2012, at Coach Picott's insistence, Coach Picott and Jane Doe stopped working out at Vanderbilt's campus.  Instead, Coach Picott went to Jane Doe's off-campus housing, which was paid for, in part, by way of Jane Doe's scholarship stipend, spending several hours in the early morning at Jane Doe's home.  Coach Picott parked in Jane Doe's garage, concealing her vehicle from any passersby.  Coach Picott sexually assaulted Jane Doe in her home, repeatedly.

170.     Throughout this entire timeframe, in order to "cover-up" what was going on, Coach Picott encouraged Jane Doe to meet with other people, and even arranged a date for Jane Doe in April 2012 with a person Coach Picott met at a bar.  However, Coach Picott also tried to dissuade Jane Doe from spending time with other men (or women).  Coach Picott even showed up unexpectedly when Jane Doe was out with friends and/or repeatedly text messaged and/or called Jane Doe to see what she was doing and who she was with, which intimidated Jane Doe and caused Jane Doe even more anxiety.

171.     Coach Picott's grooming and sexual advances caused Jane Doe to question her sexuality.  Jane Doe expressed her confusion to Coach Picott on more than one occasion because Jane Doe did not believe she was gay.  Coach Picott informed her that all "straight girls" freak out and think they are gay and that Jane Doe should not freak out.

172.    Coach Picott knew that Jane Doe's parents, family, and friends would not approve of Jane Doe having a sexual relationship, particularly with a woman and someone who was 20 years older than her.

173.    On more than one occasion, Jane Doe expressed to Coach Picott that she believed her family and friends would disown Jane Doe if their relationship was discovered.  Coach Picott knew that Jane Doe was terrified of anyone finding out what was happening.

174.    Ultimately, Coach Picott used the information that Jane Doe shared with her, including her sincerely held religious beliefs, to intimidate Jane Doe and convince Jane Doe that the acts were consensual.

175.    Throughout this timeframe, there was a climate of fear, panic, and hypervigilance for Jane Doe, which continues today.

### Coach Picott Continued to Harass and Abuse Jane Doe Even After Vanderbilt.

176.    In August 2012, Jane Doe moved to Pennsylvania to attend law school.

177.    Undeterred by distance, Coach Picott continued to maintain contact with Jane Doe and continued to manipulate and control Jane Doe via text message, phone calls, Facetime calls, and in-person.

178.    Jane Doe was intimidated by Coach Picott and feared that if she did not continue to speak with Coach Picott, Coach Picott would reveal their "relationship."

179.    For example, in the Fall of 2012, Jane Doe traveled to Dayton, Ohio, to attend the Program's game there.  Coach Picott insisted that Jane Doe stay at the same hotel as the Program and used this opportunity to sexually assault Jane Doe in Coach Picott's hotel room.

180.    In May 2013, Coach Picott was no longer employed at Vanderbilt and, instead, became a personal trainer.

181.    Coach Picott's sexual assaults against Jane Doe continued even after Coach Picott left Vanderbilt.

### Jane Doe Discovered Coach Picott's Abuse and Vanderbilt's Failures to Prevent it and Brought this Lawsuit within One Year.

182.    In cases of delayed reporting of physical, emotional, and/or sexual abuse, the focus becomes not on the predator coach or the institution that harbored them, but on the victim's delay in reporting.   Why did the young, innocent and impressionable girl who was preyed upon wait so long to come forward?  The answer is simple: the victim has been trapped in a system created from the top-down by universities, such as Vanderbilt, that place a higher value on on-the-court success and national recognition, than on protecting the young lives the predators they employ have destroyed.

183.    Not surprisingly, a student-athlete who is sexually abused by her coach is often "[t]oo afraid of the authority figure[] to become angry, she instead suffers from depression, fear, anxiety, shame, and overwhelming guilt."[34]

184.    Joan Ryan, author of "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," offered this explanation, which is applicable to any athlete:

> Elite gymnastics systematically strips away a girl's connection to her own body and mind as she is groomed from a young age to distrust what her body and mind are telling her.  When she's in too much pain to train, her coach says she's lazy.  When she's hungry, he says she's fat and eats too much.  When she's too exhausted for one more high-risk vault, she's a loser.  She comes to understand that her own feelings and perceptions not only are unreliable, they don't matter.  Her pain is dismissed. Her hunger is dismissed.  Her exhaustion is dismissed.  To fit into elite gymnastics' reality, a gymnast has to deny her own.  She becomes an expert at

---

34.    "Staying in Bounds," at 8 (quoting Peter Rutter, Sex in the Forbidden Zone: When Men in Power – Therapists, Doctors, Clergy, Teachers, and Others – Betray Women's Trust (Los Angeles: Jeremy Tarcher, Inc., 1986)).

withstanding all manner of insult to her body. She doesn't complain or make waves. She is the perfect target for a sexual predator[.][35]

185.    In the same way, the sexual, physical, emotional, and mental abuse that a young student-athlete like Jane Doe has suffered is not interpreted as such, even though it is accompanied by lasting emotional and physical damage.

186.    Sexual abuse results in long-term posttraumatic symptomology, referred to as complex post-traumatic stress disorder[36], with core symptoms including re-experiencing, avoidance, and hyperarousal. Furthermore, disclosing or recounting the experience of sexual abuse is traumatic and leads to a "double-trauma," which can result in an aftermath involving intense ruptures in day-to-day life.[37]

187.    Sexual abuse also leads to depression, phobias, obsessive-compulsive disorder, panic disorder, and chronic posttraumatic stress disorder, which can trigger eating disorders, alcohol abuse, self-harm, active and/or passive suicidal ideation, emotional disorders, relationship problems, and financial issues.

188.    For years, Jane Doe repressed memories of the abuse, was in denial that any abuse took place, was unable to accept that the events had occurred, and was unable to articulate them.

189.    Jane Doe, mistakenly, experienced feelings of complicity with her abuser and of responsibility and guilt for the abuse.

---

35.    Joan Ryan, "Little Girls in Pretty Boxes, the Making and Breaking of Elite Gymnasts and Figure Skaters," Introduction to 2018 Edition at 3-4 (emphasis original).

36.    Van der Kolk, Bessel A. *The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma.* New York, New York, Penguin Books, 2015.

37.    Helen Owton & Andrew C. Sparkes (2017), Sexual abuse and the grooming process in sport: Learning from Bella's story, Sport Education and Society, 22:6, 732-743, at 733, available at https://doi.org/10.1080/13573322.2015.1063484.

190.    She has suffered significant psychological harm and extreme emotional distress, including but not limited to physical manifestations of emotional distress such as debilitating panic attacks.

191.    By the winter/spring of 2022, however, these physical manifestations became too much for Jane Doe to bare.  Beginning on or about April 28, 2022, Jane Doe participated in intensive trauma therapy.

192.    For the first time, while participating in therapy, Jane Doe began to realize and understand that Coach Picott's conduct was, in fact, abuse and that the damages she experienced (and will continue to experience) were caused by Coach Picott's abuse.

193.    While Jane Doe was able to come to this realization and understanding, she has learned, like other survivors of sexual abuse, that trauma is not resolved overnight and the process of healing is not linear.

194.    One of the steps that Jane Doe was encouraged to take, as part of her recovery, was to discontinue all communication with Coach Picott, so that she could reclaim the power that Coach Picott had taken from her and the control that Coach Picott still had over her.  Jane Doe struggled for months, however, with whether she should take that step.

195.    Then, on October 7, 2022, Coach Picott called Jane Doe and left her a voicemail, asking Jane Doe to call her because she would "love to talk to" Jane Doe.  The experience of seeing Coach Picott's phone number pop up on her phone and listening to the voicemail triggered a series of panic attacks.

196.    As a result, on October 13, 2022, Jane Doe came to the decision to call Coach Picott over FaceTime and end their "relationship."  During the call, Jane Doe confronted Coach Picott about the abuse.  Coach Picott repeatedly interrupted Jane Doe, telling her that she was "sorry."

197.    Additionally, on or about October 3, 2022, a report on the King and Spalding independent investigation into the National Women's Soccer League, led by former acting United States Attorney General Sally Q. Yates, was publicized (the "Report").[38]

198.    The Report detailed systemic emotional abuse and sexual misconduct and a culture within professional soccer that "normalizes verbally abusive coaching and blurs boundaries between coaches and players."

199.    Jane Doe learned of this Report the same week it was issued and, on or about, October 5, 2022, Jane Doe read the Report.

200.    Thereafter, Jane Doe began to realize and understand that the toxic culture that permeated the Program empowered Coach Picott.

201.    Rather than "tough coaching," Jane Doe began to realize and understand that the verbal and emotional abuse was just that – abuse.

202.    Until on or about October 5, 2022, Jane Doe did not know that Vanderbilt's actions and inaction enabled Coach Picott to abuse her.

203.    Because Jane Doe filed this lawsuit within one year of learning not only that she was abused and the source of her trauma, but also that Vanderbilt's actions and inaction enabled Coach Picott's abuse, Jane Doe's claims are timely.

## CLAIMS

## COUNT ONE: TITLE IX SEX DISCRIMINATION
## (JANE DOE V. VANDERBILT AND VICTORIA R. PICOTT)

---

38.    Yates, Sally Q. "Report of the Independent Investigation to the U.S. Soccer Federation Concerning Allegations of Abusive Behavior and Sexual Misconduct in Women's Professional Soccer," King & Spalding (Oct. 3, 2022), available at https://int.nyt.com/data/documenttools/full-report-soccer-abuse/91e8cbcf0cd27905/full.pdf.

35

204.    Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

205.    Jane Doe was subjected to employee-on-student sex-based harassment that was so severe, pervasive and objectively offensive that it created a hostile educational environment and deprived her of educational opportunities or benefits provided by the school.

206.    Title IX of the Education Amendments of 1972 ("Title IX") states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]". 20 U.S.C. § 1681(a).

207.    Title IX's dual goals are to (1) "avoid the use of federal resources to support discriminatory practices" and (2) "provide individual citizens effective protection against those practices." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (internal quotation marks omitted) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979)).  Individuals have an implied private right of action to enforce Title IX's prohibition on intentional sex discrimination. *Cannon*, 441 U.S. at 702-03.

208.    Sexual harassment, which is defined as "unwelcome conduct of a sexual nature" includes "unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature," is a form of sex-based  discrimination covered by Title IX.

209.    Sexual violence is a form of sexual harassment and refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent.

210.    At all relevant times, Jane Doe was a "person" under the Title IX statutory language and member of a protected class.

211. At all relevant times, Defendant Vanderbilt was receiving federal funding, as contemplated by Title IX, 20 U.S.C. § 1681, *et seq.* for its activities including financial aid and research grants among other sources.

212. Vanderbilt is responsible for ensuring that all of its employees are properly trained and supervised to perform their jobs.

213. Vanderbilt is responsible for the acts and omissions of its employees and agents.

214. Vanderbilt created and/or subjected Jane Doe to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because:

      a.    Jane Doe, a student, was subjected to sexual harassment in the form of multiple sexual assaults by Coach Picott, an employee of Vanderbilt.

      b.    Jane Doe was subjected to harassment based upon sex.

      c.    Jane Doe was subjected to a hostile educational environment created by the Defendant's lack of policies and procedures and its failure to properly investigate and/or address the sexual assault and subsequent harassment.

215. Vanderbilt implemented and executed policies and customs in regard to the events that resulted in the deprivation of Jane Doe's constitutional, statutory, and common-law rights.

216. Defendant Picott's actions and conduct were carried out under one of Defendant Vanderbilt's programs.

217. Defendant Picott's conduct and actions toward Jane Doe, that being sexual harassment and sexual assaults, constitutes sex discrimination under Title IX.

218. Vanderbilt created and was deliberately indifferent to a hostile culture within the Program, by among other things: failing to institute corrective measures to prevent Defendant

Picott from sexually abusing students and athletes, failing to implement sufficient compliance and reporting policies to allow for the reporting of sexual misconduct without fear of reprisal, failing to address the hostile environment within the Program and failing to protect Jane Doe from Defendant Picott's predatory behavior.

219.    Defendant Vanderbilt had a policy of indifference to sexual misconduct on campus. Even after numerous high-profile sexual abuse scandals, Vanderbilt had actual knowledge of the problem, but failed to develop a sufficient policy to detect and prevent sexual misconduct on campus.

220.    Defendant Vanderbilt failed to adequately supervise Defendant Picott or otherwise ensure Defendant Picott complied with institutional guidelines.

221.    Defendant Vanderbilt failed to implement sufficient policies and training among staff to adequately address sexual misconduct.

222.    Upon information and belief, athletic department staff, including directors, coaches, trainers, and other support staff at Vanderbilt had a duty to report incidents of sex discrimination to the Title IX Coordinator or other appropriate school designee.

223.    On at least one occasion, a staff member of the Program walked into the locker room when Coach Picott was assaulting the Jane Doe.  Upon information and belief, the staff member failed to report the assault to her supervisors or other authority at Vanderbilt.

224.    On at least one occasion, a staff member of the Program implicitly questioned Jane Doe about her relationship with Coach Picott.  Upon information and belief, the staff member failed to report her concerns about Coach Picott's relationship with Jane Doe to her supervisors or other authority at Vanderbilt.

225. Vanderbilt created and was deliberately indifferent to a hostile culture within the Program.

226. Vanderbilt failed to comply with Title IX through deliberate indifference and its clearly unreasonable acts and omissions allowed the creation of a hostile sexual environment to female students, including Jane Doe, before the unwelcome sexual conduct Coach Picott perpetrated on Jane Doe that was severe, pervasive and objectively offensive.

227. Defendant failed to comply with Title IX before the incidents at issue occurred by failing to comply with Title IX by allowing an environment to exist that afforded Coach Picott an opportunity to sexually harass student-athletes, including Jane Doe.

228. Had Vanderbilt complied with Title IX before the incident occurred, the complained of harassment would have been prevented.

229. Defendant Vanderbilt is required under Title IX to investigate allegations of sexual assault, sexual abuse and sexual harassment. Defendant Vanderbilt failed to adequately do so.

## COUNT TWO: BREACH OF CONTRACT
### (JANE DOE V. VANDERBILT)

230. Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

231. Jane Doe entered into a contract with Vanderbilt as a student-athlete.

232. Jane Doe fulfilled her obligations under the contract by providing her services as a student-athlete at Vanderbilt.

233. Vanderbilt breached its contractual obligations to Jane Doe by failing to:

    a. prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

    b. prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.   prohibit grooming and other sexually-exploitative behavior by athletics department personnel of student-athletes;

d.   require staff members to immediately report any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

e.   mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

f.   protect Jane Doe from such abuse and other foreseeable risks; and

g.   provide a safe living and educational environment for Vanderbilt student athletes and graduate student assistants free from sexual abuse and/or sexual harassment.

234.   As a result of Vanderbilt's breaches of contract, Jane Doe suffered damages which were foreseeable, and for which recovery is now requested.

## COUNT THREE: NEGLIGENCE
### (JANE DOE V. VANDERBILT)

235.   Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

236.   Defendant Vanderbilt owed Jane Doe a duty of reasonable care.

237.   Defendant Vanderbilt breached its duty in the following ways:

a.   Failing to properly hire, train and retain staff and faculty as to proper methods to deal with reports of sexual abuse, investigate same and accommodate victims in a manner that would permit them to without undue hindrance, complete their higher education;

b.   Failing to properly and timely report incidents of claims sexual assault;

c.   Failing to provide adequate counseling and assistance to victims of sexual assault;

d.      Failing to adequately monitor and supervise departments, including athletic departments, to ensure compliance with protections and standards for sexual assault prevention, reporting and investigation;

e.      Failing to discover, develop and/or implement basic safeguards designed to prevent and/or minimize incidents of sexual assault;

f.      Failing to investigate and/or monitor persons accused of sexual assault to ensure additional events did not occur;

g.      Failing to adopt and implement adequate safeguards to prevent known sexual harassment from occurring on campus;

h.      Failing to provide adequate staff, with proper training, to counsel and assist victims of sexual assault;

i.      Tolerating sexual assailants on campus despite reports to the highest levels of their identities;

j.      Failing to adopt education programs to promote awareness of rape, acquaintance rape, and other sex crimes;

k.      Failing to adopt and enforce institutional sanctions for sex offenses, both forcible and non-forcible;

l.      Failing to adopt and enforce procedures students should follow if they become sexual assault victims, including who should be contacted, the importance of retaining evidence, and to whom the offense should be reported;

m.      Failing to inform victims that they have the option of reporting the sexual assault to law enforcement authorities and that they will receive assistance from the institution in the process;

n.      Failing to notify sexual assault victims about counseling services and options for changing academic schedules and living arrangements in the wake of a sexual assault;

o.      Failing to put in place an accurate routine procedure to notify the campus community about serious criminal activity that is likely to be a threat to students and employees;

p.      Failing to adopt and periodically review procedures to make sure they are adequate to address complaints of serious sexual misconduct.

41

q. Failing to develop a clear policy about which kinds of sexual offenses will be handled internally and which will be turned over to the criminal authorities;

r. Failing to make the goal of protecting the campus community from sexual assaults and harassment an integral part of the institution's day-to-day mission of providing a safe and secure learning and working environment;

s. Failing to adequately train and supervise its employees, agents, and/or representatives including all faculty and staff, to perceive, report, and stop inappropriate sexual conduct, sexual harassment, abuse and/or assault on campus;

t. Failing to adequately train and supervise its employees, agents, and/or representatives including all faculty and staff, to provide diligent supervision over student-athletes and other individuals;

u. Failing to adequately train and supervise its employees, agents, and/or representatives including all faculty and staff, to ensure the safety of all students, faculty, staff, and visitors to Vanderbilt's campus premises;

v. Failing to adequately train and supervise its employees, agents, and/or representatives including all faculty and staff, to provide a safe environment for all students, faculty, staff, and visitors to Vanderbilt's premises free from sexual harassment

238. As a direct and/or proximate result of Defendant Vanderbilt's actions and/or inactions, Jane Doe suffered substantial injury and damage, including: physical, emotional and psychological injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from fully performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY
## (JANE DOE V. VANDERBILT)

239.    Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

240.    Defendant Vanderbilt assumed responsibility for the safety and well-being of its students and student-athletes, including Jane Doe.

241.     Jane Doe believed that Vanderbilt had taken reasonable protective measures to protect Jane Doe and others from the risk of sexual abuse and/or sexual assault by its employees, including coaches.

242.    Defendant Vanderbilt breached its duty to take reasonable protective measures to protect Jane Doe and others from the risk of sexual abuse and/or sexual assault by Defendant Picott,

243.    Defendant Vanderbilt failed to implement reasonable safeguards to prevent acts of sexual assault, abuse, and molestation by Defendant Picott.

244.    Defendant Vanderbilt failed to implement reasonable safeguards to avoid placing Defendant Picott in positions where she would be in unsupervised contact and interaction with Jane Doe and other young student-athletes.

245.    As a direct and/or proximate result of Defendant Vanderbilt's actions and/or inactions, Jane Doe suffered substantial injury and damage, including: physical, emotional and psychological injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from fully performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and

earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT FIVE: BATTERY
## (JANE DOE V. VANDERBILT AND COACH PICOTT)

246.     Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

247.     Defendant Picott intended to commit and committed acts with the intent to cause unpermitted, harmful or offensive bodily contact with Jane Doe, including intimate parts of Jane Doe, and sexually offensive and unwanted contacts with Jane Doe directly resulted from Coach Picott's intentional acts.

248.     Defendant Picott subjected Jane Doe to an imminent battery and/or intentional invasions of her right to be free from offensive and harmful contact, and said conduct demonstrated that Defendant Picott had a present ability to subject Jane Doe to an immediate, intentional, offensive and harmful touching.

249.     Jane Doe did not and could not consent to Coach Picott's contact, which caused injury, damage, loss, and/or harm, and occurred as a result of coercion.

250.     Coach Picott exploited her position of power and authority to intimidate, overwhelm, and subdue Jane Doe.

251.     Coach Picott exploited her position of power and authority over Jane Doe, who was in no position to reject her sexual advances due to the coach-player relationship, her age, and her vulnerabilities.

252.     Vanderbilt employed and/or held Defendant Picott out to be its agent and/or representative from in and around May 2002  to in and around May 2013.

253.    Vanderbilt is vicariously liable for the actions of Defendant Picott as described above that were performed during the course of her employment, representation, and/or agency with Vanderbilt and while she had unfettered access to young female athletes on Vanderbilt's campus and premises through the athletic department.

254.    As a direct and/or proximate result of Defendant Vanderbilt's actions and/or inactions, Jane Doe suffered substantial injury and damage, including: physical, emotional and psychological injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from fully performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT SIX: ASSAULT
## (JANE DOE V. VANDERBILT AND COACH PICOTT)

255.    Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

256.    Defendant Picott intentionally committed harmful and offensive contacts against Jane Doe, including but not limited to committing nonconsensual sexual acts, including touching intimate parts of Jane Doe, against her will, for sexual arousal, sexual gratification, and sexual abuse.

257.    Specifically, Defendant Picott committed acts, which caused injury to Jane Doe by subjecting her to an imminent battery and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendant had a present ability to subject Jane Doe to an immediate, intentional, offensive and harmful touching.

45

258.     Jane Doe did not consent to the contact, which caused injury, damage, loss, and/or harm.

259.     Vanderbilt employed and/or held Defendant Picott out to be its agent and/or representative from in and around May 2002 to in and around May 2013.

260.     Vanderbilt is vicariously liable for the actions of Defendant Picott as described above that were performed during the course of her employment, representation, and/or agency with Vanderbilt and while she had unfettered access to young female athletes on Vanderbilt's campus and premises through the athletic department.

261.     As a direct and/or proximate result of Defendant Vanderbilt's actions and/or inactions, Jane Doe suffered substantial injury and damage, including: physical, emotional and psychological injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from fully performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

**COUNT SEVEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(JANE DOE V. VANDERBILT AND COACH PICOTT)**

262.     Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

263.     Defendant Vanderbilt was reckless in allowing Defendant Picott to be in a position where she could sexually assault and abuse student-athletes.

264.     Coach Picott's conduct was extreme and outrageous and intentionally caused severe emotional distress to Jane Doe.

265. Coach Picott's conduct exceeded all possible bounds of decency.

266. Coach Picott acted with the intent and knowledge that Jane Doe suffered emotional distress due to Coach Picott's coercive conduct.

267. Defendant Vanderbilt's conduct was extreme and outrageous and intentionally caused severe emotional distress to Jane Doe in that a reasonable person would not expect Defendant Vanderbilt to tolerate or permit their employee or agent to carry out sexual harassment and sexual abuse against its students after they knew or should have known of Defendant Picott's sexual harassment and sexual abuse of Jane Doe.

268. Defendant Vanderbilt held Defendant Picott in high esteem and acclaim, which in turn encouraged Jane Doe and others to respect and trust Defendant Picott.

269. A reasonable person would not expect Defendant Vanderbilt to be incapable of supervising Defendant Picott and/or preventing Defendant Picott from committing acts of sexual assault, abuse, and molestation.

270. Defendant Vanderbilt's conduct as described above was intentional and/or reckless.

271. As a direct and/or proximate result of Defendant Vanderbilt's conduct, Jane Doe suffered physical and serious emotional injury.

## COUNT EIGHT: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (JANE DOE V. VANDERBILT AND COACH PICOTT)

272. Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

273. Defendant Vanderbilt was reckless in allowing Defendant Picott to be in a position where she could sexually assault, abuse, and molest student athletes.

47

274.     A reasonable person would not expect Defendant Vanderbilt to tolerate or permit their employee or agent to carry out sexual assault, abuse, or molestation after they knew or should have known of Defendant Picott's sexual harassment and sexual assault of Jane Doe.

275.     Defendant Vanderbilt held Defendant Picott in high esteem and acclaim which in turn encouraged Jane Doe and others to respect and trust Defendant Picott.

276.     A reasonable person would not expect Defendant Vanderbilt to be incapable of supervising Defendant Picott and/or preventing Defendant Picott from committing acts of sexual assault, abuse, and molestation.

277.     Defendant Vanderbilt's conduct, as described above was intentional and/or reckless.

278.     As a direct and/or proximate result of Defendant Vanderbilt's conduct, Jane Doe suffered physical and serious emotional injury.

### COUNT NINE: NEGLIGENT HIRING AND SUPERVISION
### (JANE DOE V. VANDERBILT)

279.     Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

280.     Defendant Vanderbilt had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but it failed to do so.

281.     Defendant Vanderbilt was negligent in the retention of Defendant Picott as an employee, agent, and/or representative in its failure to adequately investigate, report and address complaints about Defendant Picott's conduct of which it knew or should have known.

282. Defendant Vanderbilt was negligent in the retention of Defendant Picott as an employee, agent, and/or representative when after it discovered, or reasonably should have discovered Defendant Picott's conduct, which reflected a propensity for sexual misconduct.

283. Defendant Vanderbilt's failure to act in accordance with the standard of care resulted in Defendant Picott gaining access to and sexually abusing and/or sexually assaulting Jane Doe and an unknown number of other individuals.

284. The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Picott created a foreseeable risk of harm to Jane Doe as well as other minors and young adults.

285. As a direct and/or proximate result of Defendant Vanderbilt's conduct, Jane Doe suffered substantial injury and damage, including: physical, emotional and psychological injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from fully performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## COUNT TEN: NEGLIGENT RETENTION
## (JANE DOE V. VANDERBILT)

286. Jane Doe hereby incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

287. Defendant Vanderbilt had a duty when credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising employees, agents and/or representatives to exercise due care, but it failed to do so.

288. Defendant Vanderbilt was negligent in the retention of Defendant Picott as an employee, agent, and/or representative in its failure to adequately investigate, report and address complaints about her conduct of which it knew or should have known.

289. Defendant Vanderbilt was negligent in the retention of Defendant Picott as an employee, agent, and/or representative when after it reasonably should have discovered Defendant Picott's conduct, which reflected a propensity for sexual misconduct.

290. Defendant Vanderbilt's failure to act in accordance with the standard of care resulted in Defendant Picott gaining access to and sexually abusing and/or sexually assaulting Jane Doe and an unknown number of other individuals.

291. The aforementioned negligence in the credentialing, hiring, retaining, screening, checking, regulating, monitoring, and supervising of Defendant Picott created a foreseeable risk of harm to Jane Doe as well as other minors and young adults.

292. Vanderbilt failed to use reasonable care in supervising Defendant Picott and did nothing to reasonably investigate, supervise or monitor Defendant Picott to ensure the safety of the athletes in its care.

293. As a direct and/or proximate result of Defendant Vanderbilt's conduct, Jane Doe suffered substantial injury and damage, including: physical, emotional and psychological injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from fully performing her daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## VIII.   PRAYER FOR RELIEF

294.    WHEREFORE, Jane Doe prays for relief as follows:

a.      Trial by jury of all of her claims;

b.      Enter judgment in favor of Jane Doe on her claim under Title IX, 20 U.S.C. § 1681(a) *et. seq.*;

c.      Enter judgment against Defendant Vanderbilt on all claims;

d.      Declare Defendant Vanderbilt's conduct in violation of Title IX of the Education Amendments of 1972;

e.      Declare Defendant Vanderbilt's conduct in violation of 42 U.S.C. § 1983;

f.      Award Jane Doe compensatory damages in an amount to be established at trial, including, without limitation, payment of Jane Doe's medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and Vanderbilt's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by Vanderbilt; and damages for past, present, and future emotional pain and suffering, ongoing mental anguish,  loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity.

g.      Award Jane Doe punitive damages for the willful violations perpetrated by Defendants;

h.      Award Jane Doe pre-judgment and post-judgment interest;

i.      Award Jane Doe court costs and expenses, including reasonable attorneys' fees  and discretionary/litigation expenses, pursuant to 42 U.S.C. § 1988(b) and/or other statutory authority;

> j. Any such other and further legal or equitable relief as the this Court deems just and proper.

## IX.    JURY DEMAND

295.    Plaintiff Jane Doe demands a trial by jury on all issues in this Complaint.


Dated: April 27, 2023                              Respectfully submitted,

                                                   By: */s/ Anne Bennett Hunter*
                                                   ANNE BENNETT HUNTER
                                                   Hunter Law Firm
                                                   101 Creekside Crossing, Suite 1700-307
                                                   Brentwood, TN 37027
                                                   anne@hunteremploymentlaw.com
                                                   (615) 592-2977
                                                   TN ID No. 022407


                                                   TINA O. MILLER*
                                                   Reisinger Comber & Miller, LLC
                                                   436 Seventh Ave #300
                                                   Pittsburgh, Pennsylvania 15219
                                                   tmiller@reisingercomber.com
                                                   (412) 894-1380
                                                   PA ID No. 71101

                                                   *To be admitted *pro hac vice*


                                                   *Attorneys for Plaintiff*