IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>VANDERBILT UNIVERSITY and VICTORIA R. PICOTT,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:23-cv-00426<br><br>JUDGE RICHARDSON |

**MEMORANDUM OPINION**

Pending before the Court is the motion to dismiss (Doc. No. 22, "Motion") filed by Defendant Vanderbilt University ("Vanderbilt") seeking dismissal of the claims against it under Fed. R. Civ. P 12(b)(6) for failure to state a claim upon which relief can be granted. The Motion is supported by an accompanying memorandum of law (Doc. No. 23, "Memorandum"). Defendant Victoria R. Picott also filed a motion to dismiss (Doc. No. 24), which was granted by this Court in an earlier order. (Doc. No. 52). Plaintiff filed a response to Vanderbilt's Motion (Doc. No. 41, "Response") to which Vanderbilt filed a reply (Doc. No. 46). For the reasons stated herein, the Motion will be GRANTED IN PART AND DENIED IN PART—namely, granted pursuant to Rule 12(b)(6) with respect to the federal claims against Vanderbilt, with the remaining state-law claims against Vanderbilt being dismissed not based on Rule 12(b)(6) as requested, but rather based on this Court's discretionary declination of supplemental jurisdiction.

## FACTS[1]

Melanie Balcomb became the head coach of Vanderbilt's women's basketball program in 2002. (Doc. No. 1 at ¶ 62). She "brought with her" Coach Picott to serve as the program's assistant coach responsible for post-player development. (*Id.* at ¶ 63). Before starting her tenure at Vanderbilt, Coach Picott had been a college women's basketball coach for over a decade at various universities. (*Id.* at ¶ 63). Around August 8, 2006, before Plaintiff had begun her senior year of high school, Coach Picott and the assistant coach for recruiting offered Plaintiff a "full-ride" athletic scholarship to play basketball for the program. (*Id.* at ¶ 64). Plaintiff accepted the scholarship and began her basketball and student career at Vanderbilt in July of 2007. (*Id.* at ¶ 76). While at Vanderbilt, Plaintiff experienced hardships as her family members became ill and she herself suffered from illness. (*Id.* at ¶¶ 80-82.) Plaintiff confided in Coach Picott, who reassured her that she had a "family" with the program. (*Id.* at ¶ 85). Plaintiff and Coach Picott grew close and developed an emotional bond during this period, and Coach Picott ingratiated herself with members of Plaintiff's family. (*Id.* at ¶¶ 86-88). Plaintiff and Coach Picott also began to pray together when Coach Picott's mother became ill during Plaintiff's senior year. (*Id.* at ¶¶ 89-90).

On the basketball court, Coach Picott came into close physical contact with players while demonstrating proper footwork and positioning. (*Id.* at ¶¶ 94-95). Coach Picott also was viewed by players as "rational" and would stand up to the "tough coaching" employed by Coach Balcomb. (*Id.* at ¶¶ 107-110). After playing for the basketball team but before she graduated from Vanderbilt,

[1] The facts herein are taken from the Complaint. For purposes of the instant Motion, the facts in the Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

Plaintiff was encouraged by Coach Picott, and invited by the program, to continue as a graduate assistant. (*Id.* at ¶ 112). This entitled Plaintiff to continue as a graduate student at Vanderbilt while helping out the basketball program but did not require her to compete as a player on the team. (*Id.* at ¶¶ 112-117). She accepted this invitation and began her graduate-school classes on or about June 10, 2011. (*Id.* at ¶ 122).

Coach Picott's mother passed away on June 17, 2011. (*Id.* at ¶ 123). Coach Picott thereafter developed an interest in religion and asked Plaintiff to participate in bible study with her. (*Id.* at ¶ 125). Plaintiff agreed, and they began a morning bible study during which they shared with one another more personal details of their lives. (*Id.* at ¶¶ 128-131). In the fall of 2011, Plaintiff accepted an invitation from Coach Picott to work out together during the mornings. (*Id.* at ¶ 133). During these workouts, Coach Picott would comment on Plaintiff's physical appearance and participate in workouts that required physical touching. (*Id.* at ¶ 134). Coach Picott also began telling Plaintiff that she was sexually attracted to her. (*Id.* at ¶ 144).

Coach Picott and other female staff members invited Plaintiff to use the female coaches' locker room, which was more convenient for Plaintiff to use. (*Id.* at ¶ 147). Once Plaintiff started using the locker room, Coach Picott would bump into her or pretend to box her out.[2] (*Id.* at ¶ 151). Coach Picott would also watch as Plaintiff changed clothes after they worked out and would change in front of Plaintiff. (*Id.* at ¶ 152). Coach Picott opened the shower door to look at Plaintiff and comment on her physique. At one point, Coach Picott also placed her hand on Plaintiff's upper thigh when the two were sharing a car together. (*Id.* at ¶¶ 153-54). At some point, Coach Picott kissed Plaintiff in a parked car in the 25th Avenue parking garage on Vanderbilt's campus. During

[2] The reference here to boxing out Plaintiff plainly is a reference to the basketball tactic of optimally positioning oneself vis-a-vis an opponent in order to maximizes the chances of grabbing a rebound in the event of a missed shot. It can, but does not necessarily, involve pushing one's backside against the opponent.

this event, Plaintiff felt "paralyzed with the [sic] fear, embarrassment and confusion." (*Id.* at ¶ 156).

Following this kiss, Coach Picott made sexual advances towards Plaintiff multiple times a day. (*Id.* at ¶ 157). Coach Picott also began performing "sexual acts" on Plaintiff in the locker room or in hotel rooms when the team was traveling for away games. (*Id.* at ¶ 161). At one point, an unidentified staff member of the program walked into the locker room while Coach Picott and Plaintiff were engaged in a sex act. (*Id.* at ¶ 223). The staff member failed to report this activity to her supervisors or other authorities at Vanderbilt. (*Id.*). At one point, an unidentified program staff member also implicitly questioned Plaintiff about her relationship with Coach Picott. (*Id.* at ¶ 224). The staff member did not report to her supervisors, or another authority at Vanderbilt, her concerns about that relationship. (*Id.*).

On or about March 17-21, 2012, in Plaintiff's hotel room in the Embassy Suites in Nashville, Plaintiff and Coach Picott had sexual intercourse. (*Id.* at ¶ 167). After this encounter, Coach Picott performed sexual acts on Plaintiff "on a near-daily basis and multiple time a day." (*Id.* at ¶ 168). Beginning in the summer of 2012, Coach Picott would work out with Plaintiff in Plaintiff's off-campus house. Coach Picott would also show up unexpectedly when Plaintiff was out with friends, which "intimidated Jane Doe and caused Jane Doe even more anxiety." (*Id.* at ¶ 170). Plaintiff expressed to Coach Picott that she thought her family would disown her if their relationship was discovered.

Jane Doe ultimately finished her studies at Vanderbilt and then moved to Pennsylvania to attend law school in August 2012. (*Id.* at ¶ 176). Plaintiff and Coach Picott maintained a relationship, and Plaintiff traveled during the fall of 2012 to Ohio to attend a Vanderbilt basketball game there, where Coach Picott performed sexual acts on her in her hotel room. (*Id.* at ¶ 179). In

May 2013 Coach Picott left Vanderbilt and became a personal trainer. (*Id.* at ¶ 180). Coach Picott and Plaintiff continued to have sexual relations after Coach Picott left Vanderbilt University. (*Id.* at ¶ 181).

Plaintiff suffered significant psychological harm and extreme emotional distress, including panic attacks, in the years following these encounters. (*Id.* at ¶ 190). On April 28, 2022, Plaintiff began intensive trauma therapy, whereby she began to "realize and understand" that the damage she experienced was caused by Coach Picott's alleged abuse. (*Id.* at ¶¶ 191-93). On October 13, 2022, Plaintiff called Coach Picott on FaceTime to end their "relationship." (*Id.* at ¶ 196). During the call, Plaintiff confronted Coach Picott about the abuse, and Coach Picott repeatedly told Plaintiff that she was sorry. (*Id.*).

PLAINTIFF'S COMPLAINT

Plaintiff initiated this lawsuit on April 27, 2023, by filing a ten-count complaint (Doc. No. 1, "Complaint"), which named both Vanderbilt (the institution) and Coach Picott (an individual) as defendants. In each of the ten counts, the claims are made against Vanderbilt. In five of them, the claims are made also against Coach Picott, while in the other five, the claims are made only against Vanderbilt.[3] As for the counts against Vanderbilt, one of them is a federal count (invoking this Court's original jurisdiction), while the remaining nine are state-law counts (invoking this Court's supplemental jurisdiction). Specifically, Plaintiff's federal count against Vanderbilt includes two claims under Title IX of the Education Amendments of 1972 20 U.S.C. §1681 et seq. ("Title IX"), and her state-law counts against Vanderbilt are claims for breach of contract,

[3] The Court previously issued an order granting Defendant Victoria Picott's motion to dismiss (Doc. No. 52). Therein, the Court found that Plaintiff failed to state a Title IX claim against Picott because Title IX does not authorize private suits against individuals. The Court also found that Plaintiff's state-law claims against Picott were barred by the applicable state statute of limitations. Therefore, the remaining claims (both federal and state) are solely against Defendant Vanderbilt.

negligence, breach of fiduciary duty, battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent hiring and supervision, and negligent retention.

## LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in a complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 167 L.Ed.2d 929 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate,

such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

DISCUSSION

As an initial matter, Vanderbilt argues that Plaintiff's federal Title IX claims, as well as all her state-law claims, should be dismissed as untimely. (*See* Doc. No. 23 at 7). Vanderbilt contends that for every claim in the Complaint, the limitations period prescribed by the applicable statute of limitations had expired before this suit was filed on April 27, 2023. After this discussion, Vanderbilt then also separately argues that Plaintiff has failed to adequately allege the elements of her claims. (*See* Doc. No. 23 at 13). As discussed in more detail below, the Court agrees with Vanderbilt regarding the sufficiency of Plaintiff's federal Title IX claims, and finds that Plaintiff's pre-assault and post-assault claims both fail as the Complaint does not provide sufficient factual allegations to plausibly suggest an entitlement to relief on either claim. Furthermore, the Court declines to exercise supplemental jurisdiction over the state-law claims alleged in the Complaint. Therefore, the Court does not reach the limitations issues, which were (in addition to being thoroughly considered by the Court before it decided they could bypassed) addressed at length by the parties in their respective briefs regarding the Motion.

**The (Sole) Federal Count (Asserting Claims Under Title IX)**

Title IX prohibits sexual discrimination at universities that receive federal funding. In the context of sexual assault, it allows for two types of claims: so-called "pre-assault" claims and so-called "post-assault" claims. Pre-assault claims are brought by plaintiffs who allege that

institutions were deliberately indifferent to reports of sexual assault and that this created a heightened risk of harassment that led to their assault. Such claims essentially allow a plaintiff to recover against institutions that were aware of sexual assault generally taking place before the occurrence of the assault against the plaintiff in particular. *See Doe on behalf of Doe #2 v. Metro. Gov't of Nashville*, 35 F.4th 459, 465 (6th Cir. 2022). Post-assault claims are brought by plaintiffs who allege that they were sexually harassed, and that empowered officials at the school learned about the harassment and yet thereafter failed to respond in a reasonable manner—thus causing the plaintiff to suffer (or be placed in an objectively reasonable fear of) additional harassment. Such claims essentially allow a plaintiff to recover from an institution that learns of harassment (through the actual notice of empowered institution officials) against the plaintiff in particular, but then does not reasonably respond to it. *See Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022). Plaintiff seemingly has alleged both types of claims in her Complaint. (*See* Doc. No. 1 at ¶¶ 206-229).

<u>Pre-Assault Claim</u>

For pre-assault claims, the Sixth Circuit requires a plaintiff to allege that:

> (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was . . . severe, pervasive, and objectively offensive[.]

*Doe on behalf of Doe #2*, 35 F.4th at 465 (citing *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020)). The focus here, as with all Title IX claims, is on the behavior (the maintenance (or lack thereof) of a policy of deliberate indifference) of the defendant institution, not on the individuals who participated in the alleged abuse.

The Complaint does not provide sufficient factual allegations to state a plausible claim for relief as required by *Iqbal and Twombly*. Instead, the Court finds that Plaintiff has merely provided a "threadbare recital[] of the elements of [the] cause of action," *Iqbal*, 556 U.S. at 678, at least regarding the first element of her claim, and that therefore her claim must be dismissed.

The first element of a pre-assault claim is that "a school maintained a policy of deliberate indifference to reports of sexual misconduct[.]" *Doe*, 35 F.4th at 465. The Complaint's references to "reports" of sexual misconduct are very limited. Construing the Complaint in favor of Plaintiff as required, it refers indirectly to such "reports" when it discusses (and provides an Internet URL address for) the 2010 "Staying in Bounds"[4] report ("*Staying in Bounds*"), which proposed a National Collegiate Athletic Association (NCAA) model policy for universities to adopt. (Doc. No. 1 at ¶ 1 n. 2). *Staying in Bounds* provided a set of "policies and practices" that Vanderbilt allegedly failed to adopt in order "to identify and prevent the grooming, exploitation, sexual harassment and sexual abuse of its student-athletes by athletic department personnel." (*Id.* at ¶ 1). Plaintiff seemingly alleges that the "alarming reports" (which, the Court infers to Plaintiff's benefit, were identified in *Staying in Bounds*) that "[s]exual relationships between coaches and student-athletes [had] become a serious problem" were not heeded by Vanderbilt, which "failed to implement and/or enforce" the policies outlined in *Staying in Bounds* (or other internal policies aimed at preventing such problematic relationships more generally). (*Id.* at ¶ 1).

As an initial matter, as far as the Complaint reveals, *Staying in Bounds* does not actually focus specifically on Vanderbilt, let alone on specific policy shortcomings at Vanderbilt with respect to sexual misconduct. And Plaintiff does not allege that the specific problem of sexual

[4] The full title of the report, as taken from the Complaint, is: "Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel." (Doc. No. 1 at ¶ 1 n. 2).

relationships between coaches and student athletes (as identified in *Staying in Bounds*) in the past had occurred in any of Vanderbilt's athletic programs, let alone been mishandled. Instead, as far as the Complaint reveals, *Staying in Bounds* was aimed generally at universities and outlined an NCAA set of model policies that it urged universities to adopt.

The instant scenario stands in clear contrast with the circumstances of *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093 (9th Cir. 2020), which illustrates the kind of prior reporting concerning sexual assault that, when referred to in the complaint, can help—though not necessarily establish by itself—plausibly suggest the first element of a pre-assault claim. In *Karasek*, the Ninth Circuit vacated a district court's dismissal of a pre-assault claim. In so doing, the Ninth Circuit found that the plaintiff's complaint described a report conducted by the California state auditor which found that the University of California "could not demonstrate that [it] consistently informed students of what to expect as the university investigated their complaints," that it did not "consistently complete investigations in a timely manner" and did not "sufficiently educate its employees and students about preventing sexual harassment, which led to the mishandling of sexual-misconduct complaints and put the safety of its students at risk." *Karasek*, 956 F.3d at 1113 (quotations and citations omitted). In that case, the auditor's report detailed issues specific to the University of California and this provided factual support for the allegations underlying the complaint. Unlike that report, *Staying in Bounds* has nothing to say about issues at Vanderbilt in particular, let alone about issues at Vanderbilt concerning especially crucial topics like sexual misconduct by coaches towards student-athletes. Thus, the Complaint's reference to *Staying in Bounds* provides little factual matter to support the plausibility of the first element of Plaintiff's pre-assault claim.

Plaintiff also makes a vague reference to Vanderbilt having experienced "numerous high-profile sexual abuse scandals" in her Complaint (Doc. No. 1 at ¶ 219). The Complaint does not provide any information regarding such scandals beyond a reference to the "Vanderbilt rape case" that Plaintiff mentions in a footnote in the Complaint. (*Id.* at ¶ 23 n. 7). And even that reference is ambiguous; Plaintiff says nothing about that case, but instead merely provides internet addresses for articles relating to it, leaving the reader to draw from those articles whatever the reader will. In any event, Plaintiff does not elaborate on the effect of the "Vanderbilt rape case" or how it demonstrated that Vanderbilt maintained a policy of deliberate indifference to reports of sexual misconduct. (*Id.*). Accordingly, the Court finds that this vague reference likewise provides little factual matter to support the plausibility of the first element of the cause of action for Plaintiff's pre-assault claim.

Instead of providing sufficient factual allegations to support her pre-assault claim, the Complaint generally provides a formulaic recitation of the elements of the claim supported by "conclusory" allegations. *Iqbal*, 556 U.S. at 678. For example, Plaintiff alleges that "Defendant Vanderbilt had a policy of indifference to sexual misconduct on campus" and "Vanderbilt created and was deliberately indifferent to a hostile culture within the Program."[5] (*Id.* at ¶¶ 218-19). As

---

[5] The Court will additionally explain in the following way why these kinds of allegations do not move the needle as to the first (or indeed any) element of a pre-assault claim.

Imagine an associate at a law firm being told by a partner that the partner has a client who was a former student-athlete at Vanderbilt and wishes to recover from Vanderbilt based on a pre-assault claim. Imagine that the associate knows absolutely nothing else of pertinence—for example, nothing about what sexual misconduct (of any kind) has ever happened at Vanderbilt, what if anything Vanderbilt has ever done in response when sexual misconduct had occurred at Vanderbilt, and what the client had claimed had happened to her—beyond the bare fact that the client would like to bring a pre-assault claim. Suppose also that the partner asks the associate to draft a complaint containing a pre-assault claim. Assume finally that the associate does the legal research necessary to determine the elements of a pre-assault claim. Such an associate, in an effort to come up with *something* in an attempt to satisfy those elements, could easily draft these kinds of conclusory assertions of—and terse apparent references to—the elements, despite not knowing anything at all relevant to the case beyond the required elements of a pre-assault claim. That is what makes these kinds of allegations ones that are devoid of *factual matter* and thus, under *Iqbal* and

previously mentioned, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to enable a claim to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. In the Court's view, except for what is described above (which as noted is of little help to Plaintiff), that is all that Plaintiff has provided in her Complaint regarding (at least) the first element of her pre-assault claim. Accordingly, irrespective of how Plaintiff fares on the other elements of this claim, the Court finds that this claim fails and must be dismissed.

<u>Post-Assault Claim</u>

For post-assault claims, the Sixth Circuit requires a plaintiff to allege that: "(1) she was sexually harassed by a teacher or professor,[6] (2) an official with authority to take corrective action had actual notice of the harassment,[7] (3) the school's response was clearly unreasonable, and (4)

---

*Twombly*, to be ignored in determining whether the complaint's factual matter plausibly suggests (as required) an entitlement to relief on the claim.

[6] The Court notes that the harassment underlying post-assault claims is not necessarily limited to harassment by teachers or professors, but can also include harassment by other officials such as athletic coaches. *See Snyder-Hill,* 48 F.4th 686 (involving harassment by a sports doctor); *Doe v. Hamilton Cnty. Bd. of Educ.,* 329 F. Supp. 3d 543, 556-57 (E.D. Tenn. 2018) (discussing post-assault Title IX claims based on student-on-student harassment).

[7] It is worth explaining both where this (second) element came from and something about what it actually means. In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), the Supreme Court initially noted essentially that the Title IX statutory term "appropriate person" was the term used for the kind of institutional official whose knowledge could be attributed to the institution for purposes of a post-assault claim. *Id.* at 290. The Supreme Court then held, "An 'appropriate person' under [Title IX] is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.* Hence, in *Wamer*, the Sixth Circuit stated, "The Supreme Court in *Gebser* explained that deliberate indifference is shown where there is an official or other person with authority to take corrective action, who has actual knowledge of [the abuse] and fails to adequately respond." *Wamer*, 27 F.4th at 466.

The Court discerns that case law has not revealed the precise contours of who in fact constitutes an "appropriate person," i.e., who is an "official with authority to take corrective action." In *Dahmer v. W. Kentucky Univ.*, 2022 WL 19296342 (6th Cir. Oct. 13, 2022) the Sixth Circuit vacated a district court's grant of summary judgment wherein the district court found that the "Director of Student Activities, Organizations, and Leaderships" did not constitute an "appropriate person" in the context of a student-on-student Title IX harassment claim. *Dahmer*, 2022 WL 19296342 at *3. In so doing, the Sixth Circuit found that the director (who had a "duty to intervene") had stated he was a "responsible employee," which under "WKU's own definition . . . is an individual who has authority to address and remedy discrimination/sexual misconduct/harassment" and that therefore there was a genuine dispute of material fact as to that issue. *Id.*

the school's deliberate indifference caused her to suffer discrimination." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 471 (6th Cir. 2022). The last requirement (i.e., causation) can be satisfied by showing that "(1) following the school's unreasonable response (2) (a) the plaintiff experienced an additional instance of harassment . . ." *Id.* This approach allows a plaintiff to recover from an institution that learns of harassment against the plaintiff in particular but then does not adequately address it.

Plaintiff has failed to provide sufficient factual allegations in her Complaint to support the second element of her post-assault claim. Plaintiff alleges that an unidentified staff member "walked into the locker room when Coach Picott was assaulting" Plaintiff and that "upon information and belief, the staff member failed to report the assault to her supervisors or other authority at Vanderbilt." (*Id.* at ¶ 223). Plaintiff further alleges that an unidentified "staff member of the Program implicitly questioned Jane Doe about her relationship with Coach Picott" and that "[u]pon information and belief, the staff member failed to report her concerns about Coach Picott's relationship with Jane Doe to her supervisors or other authority at Vanderbilt." (*Id.* at ¶ 224). These allegations comprise the entirety of the basis for the second element of the claim, which requires that "an official with authority to take corrective action had actual notice of the harassment." *Wamer*, 27 F.4th at 471.

---

Based on this case, and a common sense notion of what it means to have "authority" to "take corrective action" in response to sexual harassment by an employee of the institution (as opposed to a fellow student), the Court concludes that the second element refers essentially to an official of the institution whom the institution has empowered to (a) make administrative and disciplinary decisions concerning the employee on the institution's behalf; or (b) institutional changes (as to policy, personnel, messaging, resource allocation, etc.) that are directly responsive to institutional failings that were revealed by the particular incident of sexual harassment involving the employee. The Court finds that under that definition (or indeed any other reasonable definition that the undersigned is able to conjure up in his mind) Plaintiff has not alleged, let alone set forth factual matter to support an allegation, that such a person had ever gained actual knowledge of the alleged harassment of Plaintiff.

Defendant deftly uses this dearth of factual matter to argue in its Memorandum that "[Plaintiff] nowhere alleges that the staff members themselves were officials with authority to take corrective action" and that she "therefore has not pleaded that any official or other person with authority to take corrective action had actual knowledge of her alleged abuse." (Doc. No. 23 at 17). The Court is inclined to agree. In her Response, Plaintiff argues that she has provided enough material to support this claim because "in both instances, the Vanderbilt employee failed to report the relevant information to supervisors or other authorities at Vanderbilt, despite having a duty to do so." (Doc. No. 43 at 16). But contrary to Plaintiff's implication here, having a duty to report is not the same as having authority to take corrective action—which is what Plaintiff needs to allege to satisfy the second element of her claim.

If anything, the Complaint's allegations suggest that persons who would have authority to take corrective action did *not* have knowledge of the alleged abuse that was witnessed by staff members. The Complaint alleges that the staff member failed to report their concerns or knowledge regarding alleged abuse to their respective "supervisors or other authority at Vanderbilt" (Doc. No. 1 at ¶¶ 223-24), who are the very kinds of personnel at Vanderbilt likely to have authority to take corrective action. At the very least, the Complaint is silent about who (if not these "supervisors or other authority") with authority to take corrective action learned of the alleged abuse.

Plaintiff argues that from the fact that the staff members had a duty to report, "it is plausible to infer that the [staff members] had an obligation to take corrective action." (Doc. No. 43 at 17). At best, this inference is *possible* or *conceivable*, which is insufficient because the inference must be (as Plaintiff seems to acknowledge here) *plausible*. *Twombly*, 550 U.S. at 570 (noting that plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible"); *id.* at 546 (noting that the complaint requires factual matter to take a claim over "the line between possibility

and plausibility"). Given the Complaint's identification of the staff members as having supervisors to whom they need to report, and its clear implication they ranked below the "authority at Vanderbilt," it is implausible that the staff members were persons who had authority to take corrective action.

And the Court likewise declines to make the inferential leap that since the staff members had a duty to report, *someone* with corrective authority (even if not the aforementioned staff members or "supervisors or other authority at Vanderbilt") must have received a report; to the contrary, what is in the Complaint implies that these staff members did not do *any* reporting. Indeed, that seems to be the very point of the allegations regarding the staff members' failure to report to their "supervisors or other authority at Vanderbilt" (a point that actually is counterproductive for Plaintiff with respect to her post-assault claim): these staff members did not report to *anybody* despite having a duty to report.[8] Accordingly, the Court finds that Plaintiff has failed to provide sufficient factual allegations to plausibly suggest this element of her post-assault claim, and it therefore fails.

Plaintiff also argues that "Vanderbilt's demand [in its briefing] for more detail about who the staff members were, what authority they had, and what they saw and asked about misapplies the motion to dismiss standard" because it asks too much at this stage of the litigation. (Doc. No. 43 at 17). But the problem is not that Plaintiff has not provided "more detail," which is something that *Iqbal* and *Twombly* (which require adequate *factual* matter rather than detail) plainly do *not* require. Nor is the problem that Plaintiff has alleged insufficient factual matter about these staff

---

[8] Plaintiff presumably believed that this allegation somehow would be inculpatory as to Vanderbilt. As best the Court can tell, the idea must have been that its speaks poorly of Vanderbilt's efforts to combat sexual abuse when its staff members are not adequately trained, incentivized, etc., to carry out their duty to report. But as indicated, the allegation is at best unhelpful, and at worst quite harmful, to Plaintiff's efforts to show that the second element is plausible in this case.

members and their authority. The problem is that Plaintiff has not alleged *at all* that any official with corrective action authority was aware of the alleged abuse. Still less does Plaintiff allege any factual matter to support such an allegation.

Perhaps Plaintiff would say, were she to focus on what she actually needs to allege but did not, that it asks too much for her to include factual allegations regarding an official with corrective action learning of the abusive behavior endured by Plaintiff. She might protest that she—unlike Vanderbilt, is not in a position to know anything about that. Perhaps so; the Court realizes that there is potentially an informational imbalance in circumstances such as this. But the requirements of *Iqbal* and *Twombly* are the law, and they make no exception for cases of information imbalance; whether or not there is an information imbalance, their requirements must be satisfied. Plaintiff asserts that she should be able to "obtain discovery to fully ascertain what the individuals in question and others at Vanderbilt actually knew," (Doc. No. 43 at 17), but "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 566 U.S. at 678. Here, the Complaint is flawed not only because it lacks factual matter to support a conclusory allegation that an official at Vanderbilt with corrective action authority had the requisite knowledge for the second element, but also because it also lacks even that conclusory allegation and instead suggests to the contrary that no official at Vanderbilt with corrective action authority had such knowledge. *Iqbal* and *Twombly* require Plaintiff to include in her complaint factual matter plausibly suggesting Vanderbilt's liability on a post-assault claim, which Plaintiff has failed to do

Summary

In summary, the Court finds that Plaintiff has not provided "sufficient factual matter" to plausibly state a claim for relief for either her pre-assault claim or her post-assault claim. *Iqbal*, 556 U.S. at 678. Accordingly, Plaintiff's Title IX count is dismissed.

**State-Law Counts**

Plaintiff has alleged nine state-law counts (each containing an individual claim) against Vanderbilt. These are claims for breach of contract, negligence, breach of fiduciary duty, battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent hiring and supervision, and negligent retention.

28 USC § 1367(c)(3) states that: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if – the district court has dismissed all claims over which it has original jurisdiction." 28 USC § 1367(c)(3). The Sixth Circuit has held that "Generally, if the federal claims are dismissed before trial, … the state claims should be dismissed as well." *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284 (6th Cir. 1992) (citations omitted); *see also Saglioccolo v. Eagle Ins. Co*., 112 F.3d 226 (6th Cir. 1997) ("the district court may decline to exercise supplemental jurisdiction over a claim if 'the district court has dismissed all claims over which it has original jurisdiction'"); *Gaff v. Federal Deposit Ins. Corp.,* 814 F.2d 311, 319 (6th Cir. 1986) (finding that where a sole federal claim is dismissed under Fed. R. Civ. P. 12(b)(6), remaining pendent state claims should be remanded to state court).

The Court has dismissed Plaintiff's Title IX claims, which formed the basis of jurisdiction in this case. The Court therefore declines to exercise supplemental jurisdiction over the state-law claims against Vanderbilt. The Court notes that, by contrast, it did address and resolve the state-law claims in its memorandum opinion and order dismissing Plaintiff's claims against Coach Picott

(Doc. No. 52). That analysis involved one discrete issue, which was whether under Tennessee law the discovery rule applied to her alleged belated recognition of abuse. The claims against Vanderbilt are more varied, involving nine separate state-tort claims, with potentially different limitations analyses implicating multiple state-law issues. The claims therefore will be dismissed without prejudice to being filed in an appropriate state court.

## CONCLUSION

For the reasons discussed herein, the Court will GRANT IN PART AND DENY IN PART Defendants' Motion (Doc. No. 22) and will dismiss this action.

An appropriate accompanying order will be entered.[9]

Eli Richardson
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

[9] The Court's disposition of the state-law claims—even though a dismissal—is technically not a grant of the Motion, because Vanderbilt sought not the dismissal without prejudice due to the Court's declination of jurisdiction over those claims but rather the dismissal of those claims (as well as the federal claims) on the merits under Rule 12(b)(6). Because Vanderbilt did not receive on the state-law claims the particular result it did request, the Court describes its disposition of the state-law claims as a denial.